PIONEER SAVINGS AND LOAN COMPANY v.
MARY A. PANCOAST ET AL.

Delivered November 7, 1897.

**1. Loan Association—Right of Borrowing Member to Withdraw.**

A borrowing member of a building and loan association whose contract authorized her to withdraw on sixty days notice, after keeping her certificate in force for five years or more. and receive on such withdrawal all monthly and withdrawal installments paid on her certificate, with 10 per cent interest from the date of each payment, has the right at any time after the lapse of five years to withdraw and have the amount due on her certificate appropriated to the payment of her debt to the association, where it is sufficient to pay such debt in full.

**2. Same—Withdrawal Contract Binding.**

A contract between a building and loan association and one of its members, authorizing her to draw on sixty days notice, after keeping her certificate in force for five years or more, and receive on such withdrawal a sum equal to all monthly and withdrawal installments, is presumptively valid, even though the association loses thereby.

**3. Same—Liquidation—Postponement of Trial.**

A building and loan association which wishes the trial of an action against it postponed because it has gone into liquidation, should request such postponement, and can not complain on appeal from a judgment against it on that ground where no such request was made.

APPEAL from Bexar. Tried below before Hon. J. L. CAMP.

*John A. Green, Sr., John A. Green, Jr.,* and *Geo. D. Emery,* for appellant.—1. The members of a mutual association are liable for their proportion of the losses and expenses, as well as entitled to their proportion of profits. In a settlement with the association this proportionate share of losses and expenses may be deducted by the. association from the amount due the shareholder. Endl. on Build. and Loan Assns., secs. 77, 78; Loan Association v. Paxton, 33 S. W. Rep., 389; Engelhardt v. Association, 42 N. E. Rep., 710; O'Malley v. Loan Co., 36 N. Y., 1016; Heinbokel v. Association, 59 N. W. Rep., 1050; Chapman v. Young, 65 Ill. App., 131.

2. By reason of the fact that plaintiff failed to pay her monthly, quarterly, and withdrawal installments and the fines assessed against her for June, July, and August, 1896, the association rightfully forfeited plaintiff's stock, and she could not, therefore, cancel her mortgage in whole or in part with the withdrawal value of said stock, and judgment in this cause should have been for the defendant association for the full amount of the mortgage and interest due thereon. Building Assn. v. Loan Co., 101 Ala., 582; Freeman v. Building Assn., 114 Ill., 182; Hat-

field v. Building Assn, 132 Ind., 149; Loan Co. v. Cannon, 36 S. W. Rep., 386; 4 Am. and Eng. Encyc. of Law, 2 ed., 1044.

*Thomas Haynes,* for appellee.—1. Though a corporation make a contract in excess of its charter powers, or beyond the authority granted by statute, yet if the contract be executed by the other party to it, and the corporation has received the benefits of it, it is estopped to deny its authority to make it. Railway v. Gentry, 69 Texas, 625; Bond v. Mfg. Co., 82 Texas, 309; Bank v. Matthews, 98 U. S., 621; Assn. v. Lampson, 62 N. W. Rep., 544; Endl. on B. and L. Assns, secs. 279, 283.

2. Mutual corporations as well as others must perform their contracts so long as they are solvent, going concerns, and must pay withdrawing members in full in the order of their notices of withdrawal. Hoyt v. Association, 60 N. W. Rep., 678.

3. Appellant's motion for a new trial with the exhibits attached showed no legal ground for a new trial. The exhibits did not show that appellant had become insolvent, and if they had shown it, appellant's only proper course was to ask leave to withdraw his announcement of ready and move for a continuance.

NEILL, ASSOCIATE JUSTICE.—This suit was brought by Mary A. Pancoast, a feme sole, against the appellant, and the appellee, John F. Elliot, to cancel a certain note and mortgage described in our conclusions of fact, and for an accounting with the loan company.

The appellant answered that its predecessor, the Building, Loan, and Protective Union, had loaned Mrs. Pancoast, who was a shareholder in the company, $4500, and to secure payment of the loan she had executed a note and deed of trust, and had assigned it for sixty-three shares of $100 each as security for the money; that the stock shares had not matured; and that under the laws of Minnesota, by virtue of which the National Building, Loan, and Protective Union and appellant were incorporated, she was not entitled to withdraw from the association and have her payments on the stock and interest thereon credited upon the debt until her stock matured; and that on account of losses by the company, the value of her stock was much less than the amount she had borrowed from appellant.

That Mrs. Pancoast had defaulted in the payment of her dues on the stock and by virtue of the by-laws of the company had forfeited all payments made thereon and that by resolution of the board of its directors such forfeiture was declared, and the payments made by her on the stock had inured to the benefit of the stockholders of the company, of which she ceased to be a member by reason of the forfeiture. That she was indebted to appellant in the amount of the principal and interest and attorney's fee due upon the note sued on, for which it prayed judgment, with a foreclosure of its mortgage lien upon the land given to secure such indebtedness.

The case was tried by the court, without a jury, and judgment ren-

dered in favor of Mrs. Pancoast for $8.85, and a decree entered canceling the note and deed of trust given by her to secure the same, and also for cancellation of her stock certificate for her shares issued by the National Building, Loan, and Protective Union.

From this judgment and decree the Pioneer Savings and Loan Company has appealed.

*Conclusions of Fact.*—On the first day of May, 1890, the appellee, Mary A. Pancoast, became a stockholder in the National Building, Loan, and Protective Union, a corporation under the laws of Minnesota, and it issued to her its stock certificate No. 25198 for sixty-three shares of its stock of series C, which certifies that she was constituted a shareholder in said union, and held sixty-three shares therein of $100 each, and in consideration of a payment of the admission fee and the performance of all agreements and her full compliance with the terms, conditions, and by-laws printed on the front and back respectively of said certificate, which were referred to and made a part of the contract, said union agreed to pay her, her heirs, administrators, executors, or assigns, the sum of $100 for each of said shares at the end of six and one-half years from said date, payable in the manner and upon the conditions set forth in the by-laws attached to said certificate.

The terms and conditions printed upon the certificate, among others, are as follows:

"First. The shareholder hereby agrees to pay or cause to be paid a monthly installment of 60 cents per month on each share named in this certificate, and a quarterly installment of 25 cents on each share; the first quarterly installment is payable with the first monthly installment, and one with each third monthly installment thereafter during the continuance of this certificate, and a further sum of 25 cents on each share as a withdrawal installment for each month in which there is no quarterly installment payable as before specified. The monthly, quarterly, and withdrawal installments are each and all payable to the secretary of the union, without notice, on or before the last Saturday of the month in which they respectively fall due.

"Second. If the shareholder shall fail to pay any of said installments, or interest and premium on his loan, when due, he shall pay a fine for each delinquency of 10 cents per share on each delinquency on each share of his stock for the first month of such delinquency, and 20 cents per share for the second month, and 30 cents per share for the third month; and if all such monthly, quarterly, and withdrawal installments, and all such interest, premium, and fines be not fully paid within ninety days after such first delinquency, this certificate shall wholly lapse, and this contract shall wholly cease and become null and void as to any promise or obligation of the union, and all the payments made upon this certificate shall thereupon be and become the absolute property of the union, and the union shall thereupon not be liable for any sum whatever under this certificate. Provided, however, that the provision of this

clause shall be subject to the right of withdrawal of stock hereinafter provided in the clause in relation to withdrawals.

"Third. Withdrawals.—When the holder hereof has kept this certificate in force for a period of five years or more from the date hereof, by making all the payments herein required he may withdraw the same upon sixty days' notice thereof, in which event the union promises to pay such shareholder a sum equal to all monthly and withdrawal installments paid on this certificate, together with 10 per cent interest thereon from the date of such several payments. All liability of the holder of this certificate under the terms hereof shall cease with the date of the notice of withdrawal by either of the methods herein provided for, and all further liability of the union under the terms of this certificate shall cease with the performance of its part of the promise hereinbefore contained in relation to such withdrawal. Provided, however, that the union shall not be obliged to allow withdrawals for more than one-half the amount received in any month as monthly and withdrawal installments. Provided, further, that the union reserves the right to pay off and take up any certificate issued under the foregoing provisions for withdrawal, at any time that it may elect, upon payment of the principal sum and the interest thereon to the time of payment.

"Fourth. (In part.) In case the union has a surplus of funds, it has the right to retire this certificate at any time after three years from its date by paying a sum equal to all moneys paid by the holder hereof as monthly and withdrawal installments, with 10 per cent interest thereon from the dates of such respective payments, and the holder agrees to surrender the same and shall be released from further obligation.

"Eleventh. The by-laws of the union which are attached to and indorsed hereon are a part and parcel of this contract, and such by-laws and this certificate are to be construed together as a part of the same contract between the union and its members.

"Thirteenth. The holder of this certificate shall have no claim or interest in the affairs, assets, or funds of the union, or control over them, except as specially set forth in this contract or in the by-laws, and he or she assumes no further liability of any kind whatever, except as stated in this certificate and by-laws."

Among the by-laws printed on the back of said certificate and made a part of the contract between Mrs. Pancoast and the union are the following, stated in substance:

Article 1, section 2. The objects of this union are to afford its shareholders a safe and profitable investment and a protection for their savings and families.

Article 2, section 1. The certificate of stock and terms and conditions thereof, and the by-laws, and the application for membership, form the contract between the union and its several members.

Section 5 [in part]. All loans, whether upon stock or real estate, shall fall due at the maturity time of the stock. On all loans the member shall pay interest at 5 per cent per annum, and a premium of 5 per cent

per annum, which are payable in monthly installments at the home office of the union on or before the last Saturday of each month.

Section 7. Should a shareholder whose property is mortgaged to the union desire to release the same by the prepayment of his indebtedness, he shall, upon application to the union, be allowed to do so upon thirty days notice to the union and paying all indebtedness to the union upon his stock or otherwise, and payment of such an additional amount of interest and premium as shall be required by the board of directors, not to exceed three months in addition to the month in which the payment is made.

Section 17. The by-laws may be amended, supplemented, altered, repealed, or suspended by a two-thirds vote of the directors of the union, but no such amendment shall alter any contract or certificate already made without the assent of the holders thereof.

On the first day of June, 1890, Mary A. Pancoast, in order to obtain a loan of $4500 from said union, made and delivered to it a promissory note for that sum, payable seventy-seven months after date, with 5 per cent interest per annum and 5 per cent premium per annum, and both payable monthly; and in order to secure payment of said note she assigned her said certificate of shares to said union as collateral security, and further, joined by her husband, Aaron Pancoast, who is now dead, executed and delivered a deed of trust to John F. Elliott, as trustee, upon the following described property, situated in the county of Bexar and State of Texas, to wit: A lot in that portion of the city of San Antonio known as "La Villita," on the east side of the San Antonio River, having a front of 79 feet, more or less, on the west side of Presa Street; said lot being the eastern one-half of the middle one-third of a lot formerly belonging to John C. Hays. Said deed of trust, which is of record in volume 81, page 281, of the records of said Bexar County, provided that it should be null and void upon the payment of said note.

On June 15, 1890, said appellee received in cash from said union for the note so secured $4324.50, the said union having deducted from the face amount $63 for withdrawal installments upon said certificate for the months of June, July, September, and October, 1890, and the further sum of $112.50 for interest and premium on the said loan for three months beginning with June, 1890.

All negotiations between appellee, Mary A. Pancoast, and said union on said shares of stock and loan took place and said certificate was delivered and money received in Bexar County, Texas.

The National Building, Loan, and Protective Union was incorporated by virtue of the laws of the State of Minnesota on December 16, 1885. After stating the name of the corporation, its charter is as follows:

"2. The general nature of the business to be transacted by the corporation shall be carrying on the business of a building and loan association, the purchase, sale, and holding of real estate, lands, tenements, and hereditaments, the building of houses and improvement of real estate, by the raising of funds to be loaned to its members for such purposes,

the issuance of shares of stock of the corporation to its members and collection of membership fees, dues, assessments, and premiums on the same, mortgaging and leasing of real estate, loaning and investing the moneys and funds of the corporation.

"3.  This corporation shall commence on the twelfth day of January, A. D. 1886, and shall continue thirty years.

"4.  The capital stock of this corporation shall be $50,000,000, divided into 500,000 shares of $100 each, which stock shall be represented by the subscription of shares by its members to be paid in such installments as may be provided by the by-laws of the corporation.  The capital stock may be increased at any time by the board of directors as provided by the laws of the State of Minnesota.  The corporation may commence business when 1000 shares of stock have been subscribed.

"5.  The highest amount of indebtedness or liability to which this corporation may at any time be subject shall be $15,000 above its liabilities to its members on its certificate of shares, but such indebtedness or liability may be increased for the purpose of redeeming its certificate to an amount not to exceed $50,000."

The sixth, seventh, eighth, and ninth paragraphs of the charter relate to the organization of the union, and are not material to this case.

"10.  The board of directors shall from time to time adopt by-laws, rules, and regulations for the government of the association and the conduct of its business."

On June 17, 1889, the said union filed its charter with the Secretary of the State of Texas, and obtained a permit to do business in said State.

The National Building, Loan, and Protective Union continued to do business under that name until May 26, 1891, at which time, by amendments to its articles of incorporation, it changed its name to the Pioneer Savings and Loan Company, and since that time has been known by that name.  Up to the time of the trial of this case it continued to do business as formerly, its name being only changed as stated, but its identity not affected.

The act relating to building, loan, and saving associations doing a general business passed by the Legislature of the State of Minnesota and approved by the Governor April 22, 1889, is, so far as it may affect this case, as follows:

"Section 1.  Whenever any number of persons, not less than ten, desire to be incorporated as a building and loan association for the purpose of accumulating the savings and funds of its members and lending the funds so accumulated, they shall make out and execute a written declaration to that effect in the form now provided by the statute for the execution of deeds of real estate to entitle the same to record."

"Section 4.  For every loan made, a note non-negotiable or bond secured by first mortgage on real estate shall be given, which security shall be in double the value of the loan, and satisfactory to the directors, and shall be accompanied by a transfer and pledge of the share of the borrowers to the association.  The shares so pledged shall be held by the

corporation as collateral security for the performance of the conditions of said note or bond and mortgage; provided, that the shares, without other security, may, in the discretion of the directors, be accepted as security for the loans of an amount not exceeding their withdrawal value as provided by this act."

"Section 27. Any shareholder whose stock has not been declared forfeited in such association and whose share or shares are not pledged upon a loan, may withdraw such share or shares from the association at any time after one year by giving at least sixty days' notice in writing to the secretary of his intention to do so. Upon receipt of such notice the same may be considered a withdrawal by such person, and the association may, within sixty days, dispose of said stock, and the member shall assign the same for that purpose. At the end of sixty days, the association shall pay to the member so surrendering as follows: * * * If such stock is more than two years old, the member, upon such surrender, shall receive in addition to the amount specified at least three-fourths of all profits standing to the credit of such shares. * * * Provided further, that the foregoing provisions in relation to withdrawals shall not apply to any association heretofore organized under the laws of this State which has issued shares of stock that mature at a fixed time."

The appellee, Mary A. Pancoast, paid to said union and appellant company a monthly withdrawal and quarterly installment upon said certificate, and all interest and premiums upon said note, at the times and in accordance with the terms of said certificate and note, up to and including all such installments, interest, and premiums due to May 15, 1896, the total amount so paid being $3477.60. The interest on this amount at 10 per cent per annum from the time of each payment was, on May 15, 1896, $1043.28. Since that time she has made no payments on her stock or upon the loan.

On May 9, 1896, appellee made application and gave notice in due form to the appellant of withdrawal from said association, and of her desire to prepay the loan made to her by the National Building, Loan, and Protective Union by having the withdrawal value on her stock applied upon the loan, she having then, as before stated, paid all installments and dues for six years. After this notice was given and application made, on August 8, 1896, the appellant refused to accept such notice and application as binding upon it, upon the ground that she had no right to give any notice of withdrawal until she paid her mortgage indebtedness in full, and insisted that she pay her dues or suffer forfeiture of her contract in accordance with its terms. In the communication containing this refusal, it stated that it could not accept the stock certificate and apply it at a greater amount than its actual value, which it claimed to be $2572.10, and that if she wished to surrender it at any time before the 30th of August, upon that basis, the company would accept it for that amount. Otherwise, unless the dues were paid by her, they would declare the stock forfeited as soon as it was ninety days in arrears. No further payments having been made upon the stock, on November 5, 1896, by a resolution

of appellant's board of directors, Mrs. Pancoast's stock was declared forfeited for nonpayment of dues thereon.

Emerson Cole, the president and general manager of the Pioneer Savings and Loan Company, testified that each share of stock of series C, bearing the same date as that of Mrs. Pancoast, which had paid all its dues in full to May 15, 1896, had the same value, and that the amount paid by Mrs. Pancoast as monthly withdrawal installments on her stock was $3477.60. That the net earnings credited to said stock, after deducting the losses of the corporation, was $40.95, and that the payments and profits added gave the total value of her stock at that time.

*Conclusions of Law.*—It is contended by appellant that the laws of Minnesota were a part of the contract between it and Mrs. Pancoast, and that such laws expressly forbade the withdrawal of shareholders whose stock was pledged as collateral security for a loan of the association. If it should be conceded that the law of appellant's domicile entered into and became a part of the contract, it does not appear from the record that there was any law of Minnesota in force at the time appellant was incorporated imposing such inhibition. As is seen from our conclusions of fact, the appellant was incorporated on December 16, 1885, and it is expressly provided by the Act of April 22, 1889, that the provisions of that act relating to withdrawals "shall not apply to any association heretofore organized under the laws of that State which has issued shares of stock that mature at a fixed time."

It is a general principle in the law of corporations, applicable to every kind of written contract executed ostensibly by the corporation, and to every kind of act done by its officers and agents in its behalf, that where the officer or agent is the appropriate officer or agent to execute a contract or to do an act of a particular kind in behalf of the corporation, the law presumes a precedent authorization, regularly and rightfully made, and it is not necessary to produce evidence of such authority. 4 Thomp. on Corp., 5029. In the absence then of proof to the contrary, it will be presumed that the contract between appellant and Mrs. Pancoast authorizing her in event she kept her certificate in force for a period of five years or more from its date, to withdraw upon sixty days notice thereof, and the promise of appellant to pay her a sum equal to all monthly and withdrawal installments paid on the certificate, together with 10 per cent interest thereon from the date of such several payments, was valid. This contract being valid, and appellee having fully complied with the same, and the sum equal to all monthly and withdrawal installments paid by her on the certificate, together with 10 per cent interest thereon from the date of such several payments, being in excess of the money borrowed, for which the note and mortgage were given, she had a right to have the amount paid by her, together with the interest credited upon her debt, and withdraw from the association.

After the appellant owed her, under the terms of its contract, more than she was due it upon the note and mortgage, it could not object to

her having what was due her appropriated to the payment of the debt she owed the concern. The amount due her was properly estimated upon the basis of the contract between them, and the fact that the association may have lost in its venture did not relieve it from the terms of its obligation. It had no lien upon her certificate of shares further than to secure what was due from her, and when this debt was paid, according to the contract, the lien on her certificate of shares, as well as the mortgage on her property, was extinguished when she gave the company notice of withdrawal. From this it follows that the court did not err in rendering judgment in her favor canceling the note and mortgage in controversy.

It appears from exhibits attached to appellant's motion for a new trial, that appellant's counsel were notified after the trial began that appellant had gone into voluntary liquidation. The fact that it was in liquidation did not signify that it was insolvent; besides, its president testified that it was not and could not from its very nature become insolvent. If the appellant wished to postpone the trial because it had gone into liquidation, its counsel should have requested such postponement, but they failed to make such request, but took chances on a verdict, and having done so, appellant could not afterwards complain.

The contention of appellant that it was entitled to a judgment for the amount of its mortgage and unpaid interest to the date of trial, together with a foreclosure of its lien upon the land described in the mortgage, can not be entertained by this court. It amounts to the corporation saying to appellee: "According to my contract I owed you more than enough to cancel your indebtedness to me, but because you asked me to perform my obligation, I have taken from you and appropriated to myself all the money you intrusted to my hands. Now that which was yours is mine, and I must have that which could have never been mine had I lived up to my agreement."

The judgment of the District Court is affirmed.

*Affirmed.*

Writ of error refused.